IN THE

UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 22-13018
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

Versus

ALLEN J. PENDERGRASS,

Defendant-Appellant.
_____

A DIRECT APPEAL OF A CRIMINAL CONVICTION
FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION
_____

INITIAL BRIEF

> SYDNEY R. STRICKLAND
> Georgia Bar Number: 418591
> Strickland Webster, LLC
> 830 Glenwood Ave SE
> Suite 510-203
> Atlanta, GA 30316
> 404-590-7967
> Attorney for Appellant Pendergrass

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee,

versus                                              APPEAL NO. 22-13018-J

ALLEN J. PENDERGRASS,

　　　　Defendant - Appellant.
_____/

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Counsel hereby certifies that the following may have an interest in

the outcome of this appeal:

　　　Actor's Express – Victim;

　　　Anand, Justin S. – United States Magistrate Judge, Northern District of

Georgia;

　　　Ashley, Frederick – Victim;

　　　Bone, James H. – Victim;

　　　Brown, Jeffrey Aaron – Assistant United States Attorney;

　　　Buchanan, Ryan J. – United States Attorney, Northern District of

Georgia;

Chartash, Randy Scott – Assistant United States Attorney;

Citronberg, Robert H. – Former counsel for Defendant/ Appellant;

City of Atlanta Finance Department, Georgia – Victim;

City of Fort Collins, Colorado – Victim;

Comer, Lou – Victim;

Durrett, Saraliene – Former counsel for Defendant/ Appellant;

Georgia Municipal Association – Victim;

Harris County, Texas- Victim;

Johnson, Coleman & Stephenson LLC – Victim;

King, Tracia M. – Assistant United States Attorney;

Larkins, John K. III – United States Magistrate Judge, Northern District of Georgia;

Long, Weinberg, Ansley & Wheeler – Victim;

McQueen, Terrell – Co-Defendant

Pendergrass, Allen J. – Defendant/Appellant;

Salinas, Catherine M. – United States Magistrate Judge, Northern District of Georgia;

Stolze, Teresa Marie – Assistant United States Attorney;

Strickland, Sydney – Counsel for Defendant/ Appellant;

Toson, Sonia – Victim;

Totenberg, Amy – United States District Judge, Northern District of

Georgia;

No publicly-traded company or corporation has an interest in the

outcome of this appeal or case.

Dated this 7th day of February, 2023.

/s/*Sydney Strickland*
Sydney Strickland
Georgia Bar No. 418591
Attorney for Allen J. Pendergrass

Strickland Webster, LLC
830 Glenwood Ave SE
Suite 510-203
Atlanta, GA 30316
(404) 590-7967
sydney@stricklandwebster.com

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Rule 34(a), F.R.A.P., the Defendant-Appellant requests oral argument because it would significantly aid in the decisional process.

## STATEMENT OF TYPE SIZE AND STYLE

Pursuant to 11th Cir. R. 28-2 (d), counsel for Appellant hereby certifies

that the size and style of type used in this brief is Book Antiqua 14 PT.

## TABLE OF CONTENTS

CIP..............................................................................................................C1-3

STATEMENT REGARDING ORAL ARGUMENT..........................................i

STATEMENT OF TYPE SIZE AND STYLE......................................................ii

TABLE OF AUTHORITIES ...............................................................................v

STATEMENT OF JURISDICTION..................................................................ix

STATEMENT OF THE ISSUES ........................................................................1

STATEMENT OF THE CASE ...........................................................................2

    I.  Course of Proceedings ................................................................................2

    II.  Statement of the Facts .............................................................................2

       i.   Motion to dismiss due to unconstitutional pre-indictment delay ....4

       ii.  Other acts evidence................................................................................11

       iii.  Trial ........................................................................................................12

       iv.  Motion for New Trial and Renewed Motion for Judgment of
       Acquittal ................................................................................................22

       v.  Sentencing.............................................................................................23

STANDARDS OF REVIEW ..............................................................................27

SUMMARY OF THE ARGUMENT .................................................................28

ARGUMENT AND CITATIONS OF AUTHORITY .....................................30

    I.   The nearly four-year delay in indicting Mr. Pendergrass violated his
    Fifth and Sixth Amendment rights, and the district court erred in
    denying his motion to dismiss the indictment on this basis. ...................30

       A.  The pre-indictment delay of nearly four years violated Mr.
       Pendergrass' Fifth Amendment due process rights................................31

       B.  The pre-indictment delay of nearly four years violated Mr.
       Pendergrass' Sixth Amendment speedy trial right.................................35

       C.  Alternatively, this Court should remand to the district court for an
       evidentiary hearing. ................................................................................43

    II.  There was insufficient evidence to sustain the convictions for Counts
    7 and 8, which charged aggravated identity theft. ....................................44

III. The district court abused its discretion by admitting evidence of uncharged acts that was more prejudicial than probative. ....................... 47

    D. The combined prejudice from the erroneous admission of this evidence requires that Mr. Pendergrass's convictions be vacated. ....... 54

IV. The district court erred by applying the two-point enhancement for use of an authentication feature. ................................................................. 56

V. The district court plainly erred by denying Mr. Pendergrass his right to allocute at sentencing. ................................................................................. 59

CONCLUSION ....................................................................................................... 62

CERTIFICATE OF COMPLIANCE ................................................................... 63

CERTIFICATE OF SERVICE ............................................................................. 64

# TABLE OF AUTHORITIES

## SUPREME COURT CASES

*Barker v. Wingo*, 407 U.S. 514 (1972) ................................................39, 40, 41, 42

*Doggett v. United States*, 505 U.S. 647 (1992) ............................................... 40, 41

*Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) ............................ 60

*Rosemond v. United States*, 572 U.S. 65, 76 (2014)....................................... 45, 46

*United States v. Lovasco*, 431 U.S. 783, 788–91 (1977)....................................... 31

*United States v. MacDonald,* 456 U.S. 1, 10 n.11 (1982) .................................... 35

*United States v. Marion*, 404 U.S. 307, 324 (1971) ....................................... 31, 35

## CIRCUIT COURT CASES

*Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) ..................... 37

*Gravitt v. United States*, 523 F.2d 1211, 1215 n.6 (5th Cir. 1975).................... 38

*Stoner v. Graddick*, 751 F.2d 1535, 1541-42 (11th Cir. 1985) ........................... 31

*United States v. Barrington*, 648 F.3d 1178, 1192 (11th Cir. 2011) .................. 45

*United States v. Benitez*, 34 F.3d 1489, 1494 (9th Cir. 1994) ............................ 36

*United States v. Chavez*, 951 F.3d 349, 362 (6th Cir. 2020) .............................. 46

*United States v. Cruz*, 713 F.3d 600, 607 (11th Cir. 2013)................................. 58

*United States v. De La Pena-Juarez*, 214 F.3d 594, 598 (5th Cir. 2000) ............ 37

*United States v. DeTienne*, 468 F.2d 151 (7th Cir. 1972) ................................... 38

*United States v. Doyle*, 857 F.3d 1115, 1118 (11th Cir. 2017) ...............27, 59, 61

*United States v. Drummond*, 240 F.3d 1333, 1336 (11th Cir. 2001) ................. 37

*United States v. Edouard,* 485 F.3d 1324, 1344 (11th Cir. 2007) ...................... 48

*United States v. Ford*, 784 F.3d 1386, 1392 (11th Cir. 2015) ...................... 27, 49

*United States v. Garcia-Martinez*, 254 F.3d 16, 20 (1st Cir. 2001).................... 37

*United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016) ..................... 27

*United States v. Gorman*, 613 F.3d 711, 719 (7th Cir. 2010).............................. 49

*United States v. Green*, 617 F.3d 233, 248-49 (3d Cir. 2010) ...................... 33, 49

*United States v. Guevara-Umana*, 538 F.3d 139, 142 (2d Cir. 2008) ................ 37

*United States v. Ingram*, 446 F.3d 1332, 1338 (11th Cir. 2006) ................... 40, 41

*United States v. Innocent*, 977 F.3d 1077, 1081 (11th Cir. 2020) ...................... 60

*United States v. Knight*, 562 F.3d 1314, 1324. (11th Cir. 2009)........................ 35

*United States v. Machado*, 886 F.3d 1070, 1087 (11th Cir. 2018) ..................... 60

*United States v. Nixon*, 634 F.2d 306, 309 (5th Cir. 1981)........................... 37, 38

*United States v. Noel*, 231 F.3d 833, 836 (11th Cir. 2000) ................................. 37

*United States v. Pasillas-Castanon*, 525 F.3d 994, 997 (10th Cir. 2008) ........... 37

*United States v. Perez*, 661 F.3d 568, 584–85 (11th Cir. 2011) ................... 60, 61

*United States v. Prouty*, 303 F.3d 1249, 1253 (11th Cir. 2002).................... 61, 62

*United States v. Smith*, 231 F.3d 800, 806-07 (11th Cir. 2000) .......................... 27

*United States v. Taylor*, 818 F.3d 671, 676 (11th Cir. 2016) ........................ 58, 59

*United States v. Van De Walker*, 141 F.3d 1451, 1452 (11th Cir. 1998) ........... 27

*United States v. Wilkins*, 139 F.3d 603, 604-05 (8th Cir.1998) ......................... 56

*United States v. Woolfolk*, 399 F.3d 590, 596 (4th Cir. 2005) ........................... 36

## STATUTES

18 U.S.C. § 1028(d)(1) ................................................................................ 57

18 U.S.C. § 1028(d)(7)(A) .......................................................................... 57

18 U.S.C. § 1028A ............................................................................. passim

18 U.S.C. § 1956 ........................................................................................ 23

28 U.S.C. § 1291 ...................................................................................... viii

## RULES

11th Cir. R. 28-2 (d) .................................................................................... ii

Fed. R. Crim. P. 32(i)(4)(A)(ii) ................................................................. 60

Fed. R. Evid. 403 ........................................................................48, 49, 51, 54

Fed. R. Evid. 404(b) ............................................................................ passim

Fed.R.App.P. 32(a)(7)(B)(iii) ..................................................................... 63

Fed.R.Crim.P. 48(b)(1), (b)(3) ................................................................... 35

Federal Rule of Appellate Procedure 4 ...................................................... viii

Rule 34(a), F.R.A.P. ....................................................................................... i

SENTENCING GUIDELINES

U.S.S.G § 2S1.1 ................................................................................. 23

U.S.S.G § 2S1.1(b)(3) ........................................................................ 23

U.S.S.G. § 2B1.1 ............................................................................... 23

U.S.S.G. § 2B1.1(b)(11)(A)(ii) .................................................... 23, 57

U.S.S.G. § 2B1.6 ........................................................................ 25, 58

## STATEMENT OF JURISDICTION

The Eleventh Circuit Court of Appeals has jurisdiction to consider this case pursuant to 28 U.S.C. § 1291 and Federal Rule of Appellate Procedure 4. This case involves a direct appeal of a criminal conviction and sentence imposed in the United States District Court for the Northern District of Georgia, Atlanta Division.

## STATEMENT OF THE ISSUES

I.    The nearly four-year delay in indicting Mr. Pendergrass violated his Fifth and Sixth Amendment rights, and the district court erred in denying his motion to dismiss the indictment on this basis.

II.   There was insufficient evidence to sustain the convictions for Counts 7 and 8, which charged aggravated identity theft.

III.  The district court abused its discretion by admitting evidence of uncharged acts that was more prejudicial than probative.

IV.   The district court erred by applying the two-point enhancement for use of an authentication feature.

V.    The district court plainly erred by denying Mr. Pendergrass his right to allocute at sentencing.

## STATEMENT OF THE CASE

### I.    Course of Proceedings

On or about June 27, 2017, Mr. Pendergrass and co-defendant Terrell McQueen were indicted on charges of mail fraud (counts 1-5), money laundering conspiracy (count 6), and aggravated identity theft (counts 7-10). (Doc. 1). Mr. Pendergrass proceeded to trial and was convicted of all counts. (Docs. 240, 250).  He was sentenced to a total term of 46 months in prison. (Doc. 289).  The district court granted Mr. Pendergrass' motion for bond pending appeal. (Doc. 323).

### II.    Statement of the Facts

On or about June 27, 2017, Mr. Pendergrass and co-defendant Terrell McQueen were indicted on charges of mail fraud (counts 1-5), money laundering conspiracy (count 6), and aggravated identity theft (counts 7-10). (Doc. 1).  The indictment alleged that Mr. Pendergrass and McQueen, while operating the businesses Asset Financial Recovery, LLC, ("Asset Financial") and Guishard, Wilburn, and Shorts, LCC ("Guishard"), devised a scheme to defraud the City of Atlanta by contacting the city and requesting lists of unclaimed funds, mailing correspondence and limited power of attorney forms with forged signatures fraudulently claiming that one of their

2

companies was acting on behalf of owner of the unclaimed funds, and depositing the fraudulently obtained funds into banks accounts they controlled. (*See id.*).

The indictment alleged five specific acts of mail fraud occurring on April 5, 2013 and May 13, 2013. (Doc. 1 at 4). They involved checks from the City of Atlanta for funds owed to: Johnson, Coleman, and Stephenson, LLC for $8,000 (Count 1); Georgia Municipal Associates for $76,636.28 (Count 2); Long, Weinbery, Ansley & Wheeler for $26,874.42 (Count 3); James H. Bone, Trustee for $14,875.67 (Count 4); and Actors Express for $11,000 (Count 5). The money laundering conspiracy was alleged to have begun on a date unknown and continuing until April 2014. (*Id.* at 5). The aggravated identity theft charges tracked the allegations outlined in counts 1-5. (*Id.* at 6-8).

Mr. Pendergrass was released on bond after arraignment. (Doc. 22). While represented by his first appointed attorney, Mr. Pendergrass filed several motions that were denied by the district court. (*See* docs. 46, 52). The case was then set for trial. (*See* doc. 56). Subsequently, McQueen entered a guilty plea to Count 8, pursuant to a plea agreement. (Doc. 59).

In December of 2018, Mr. Pendergrass filed *pro se* a "motion to dismiss for ineffective assistance of counsel." (Doc. 79). After a hearing, the district

3

court ordered that new counsel be appointed.  (Docs. 80, 81).  Through new counsel, Mr. Pendergrass filed motions to dismiss the indictment on both statutory and constitutional speedy trial grounds. (Docs. 89, 90).

      i.    <u>Motion to dismiss due to unconstitutional pre-indictment delay</u>

In his motion to dismiss the indictment on constitutional grounds, Mr. Pendergrass argued that his Fifth and Sixth Amendment rights were violated due to the substantial delay between his arrest and his indictment. (*See* doc. 90).  Mr. Pendergrass explained that he was arrested pursuant to a warrant issued by a Fulton County magistrate judge on September 19, 2013, for charges "directly related" to the instant federal case: charges that Mr. Pendergrass and others had defrauded the City of Atlanta by claiming to represent individuals and businesses who were owed money by the city and then used the recovered funds for personal expenses instead of returning them to the individuals or businesses  (*Id*. at 1-2).  The allegations of fraud related to Asset Financial and Guishard. (*Id.* at 1).

 Mr. Pendergrass argued that his arrest for charges in Fulton County, which were never prosecuted, were merely a "ruse" to place him under supervision while the Northern District of Georgia and the Southern District of Ohio coordinated their efforts to prosecute him. (*Id.* at 11-12). He

submitted evidence from the Fulton County case showing that he was granted a bond on October 4, 2013—approximately two weeks after his arrest—and was subsequently released from Fulton County pretrial supervision for lack of prosecution on April 3, 2014. (*Id.* at 2 and attached Exhs. A, B, and C). Before the he was released from supervision—on January 30, 2014—Mr. Pendergrass was charged in the Southern District of Ohio with crimes arising from his operation of Guishard. (*Id.* at 2 and attached Exh. D). It was not until after Mr. Pendergrass's 30-month sentence for that case was almost complete that he was indicted in the Northern District of Georgia— the instant case. (*Id.* at 8).

Mr. Pendergrass asserted that the failure to bring federal charges earlier "was a result of a calculated decision [by the government] to permit his prosecution in multiple district for related events and to gain tactical advantage," and thus the pre-indictment delay of almost four years violated his Fifth Amendment due process rights and his Sixth Amendment speedy trial rights. (*See generally* doc. 90). He argued that, because the Fulton County charges were merely a ruse, the time between his arrest in Fulton County and the 2017 federal indictment should be considered in the speedy trial analysis. (*Id.* at 5-10). He further argued that the pre-indictment delay

violated his due process rights because the government intentionally delayed the indictment to get a tactical advantage and he suffered actual prejudice as a result. (*Id.* at 10-12).

The government filed a response, arguing that Mr. Pendergrass's Sixth Amendment pretrial rights did not attach when he was arrested on state charges, he had not shown the requisite unnecessary delay, and his claim that the Fulton County action was a ruse was unsupported. (Doc. 96 at 1-2). The government further argued that Mr. Pendergrass's due process rights were not violated because he had not sufficiently alleged actual prejudice from the delay, and had not shown that the delay was the product of a deliberate action by the Government designed to gain a tactical advantage. (*Id.* at 10-13).

Mr. Pendergrass filed a reply and attached documents showing that federal law enforcement officers from the United States Postal Inspection Service ("USPIS") were involved in the matter from at least the time of his arrest on the state charges. (Doc. 101 and attachments). This included a report from the Atlanta Police Department stating that the USPIS would be seeking federal prosecution, and another document showing that property seized at the time of his arrest was turned over to USPIS officers. (*Id.* at 1-2).

As to the prejudice, Mr. Pendergrass asserted that the delay ensured that he would be sentenced separately in two different districts if convicted in both the Southern District of Ohio and the Northern District of Georgia. (*Id.* at 8-9). He also pointed to a recent "hacking event" that would make it difficult to obtain records from the city of Atlanta. (*Id.* at 9). Finally, he argued that prejudice should be presumed because of the nature and extent of the delay. (*Id.* at 9). Mr. Pendergrass asserted that the length of the delay was sufficient to warrant an evidentiary hearing on the matter, and also requested a hearing "on the issue of communication between state and federal authorities." (*Id.* at 4, 6).

Eventually, the district court denied the motion to dismiss on statutory speedy trial grounds, but decertified the case and referred the motion to dismiss on constitutional grounds to the magistrate judge. (Doc. 111). Subsequently, Mr. Pendergrass filed a supplemental brief with which he submitted documentation showing (1) that Atlanta Police detective ("APD") Douglas Ricks was the main law enforcement witness in the instant case, the Fulton County case, the Ohio case, and another related case in Colorado; (2) Mr. Pendergrass was denied release to a halfway house while serving his Ohio sentence because of the pending Fulton County case, which was

"mistakenly" listed as open at the time; (3) the Fulton County District Attorney's Office was in contact with the prosecuting attorney for the instant case, Assistant United States Attorney Jeff Brown, as early as May 2014. (Doc. 143 at 2-4).

Mr. Pendergrass asserted that this evidence supported his prior arguments. (*Id.*). He also noted that the Fulton County District Attorney's Office and APD had failed to provide other documentation requested in subpoenas and failed to respond to inquiries from Mr. Pendergrass's attorney. (*Id.* at 6-7). The Fulton District Attorney's Office indicated that it had no records responsive to the subpoena for, *inter alia*, the file related to the case, reports or notes, or "other information" related to the investigation of Mr. Pendergrass. (Doc. 143-5). He requested an evidentiary hearing to require employees from APD and Fulton County to testify about the matter. (Doc. 143 at 7).

The magistrate judge did not grant an evidentiary hearing, and instead held oral argument on the motion. (Docs. 145, 151). During that argument, Mr. Pendergrass again asked for an evidentiary hearing, but the magistrate judge did not grant that request. (Doc. 158 at 4, 6, 14). After that oral argument, the magistrate issued a report and recommendation (R&R)

8

recommending that the motion be denied. (Doc. 152). The R&R found the

following facts:

> Federal law enforcement agents were assisting APD at the time that Mr. Pendergrass was arrested and when a search warrant for his office was executed, that federal agents were present for those events, that all electronic evidence was "immediately" turned over to federal agents, and APD understood that USPIS was planning to seek a federal prosecution. (*Id.* at 4). On the day of the search, September 19, 2013, Mr. Pendergrass was arrested by APD officers; he remained in state custody until October 4, 2013, when he was released on bond due to the state's failure to indict him.
>
> On January 30, 2014, a federal grand jury in the Southern District of Ohio indicted Mr. Pendergrass on charges arising from the deposit of stolen U.S. Treasury checks in 2012.  He was convicted and sentenced to 30 months in prison, with a projected release date of August 28, 2017.
>
> According to the government, federal prosecutors adopted the City of Atlanta unclaimed funds case in the spring of 2014, but did not obtain an indictment at that time.  In 2015 and 2016, the Federal Bureau of Prisons ("BOP") contacted Fulton County multiple times about the status of the charges from the September 2013 arrest, including requesting that the County either file a detainer or indicate that it had no interest in prosecuting Mr. Pendergrass. In November 2015, the BOP declined to release Mr. Pendergrass to a halfway house because of the Fulton charges. A BOP memo from 2016 shows that, at some point, the Fulton County District Attorney's Office advised BOP that "the Indictment is still pending and would be presented to the Grand Jury in 2017."  Thus, Mr. Pendergrass was never permitted to go to a halfway house.
>
> On June 27, 2017, just as Mr. Pendergrass was about to be released from federal custody, the instant indictment was

returned. In 2019, in response to a subpoena, Fulton County advised that their case was "mistakenly listed as 'open' in the court's online case management system."

(*Id.* at 2-7). The R&R concluded that Mr. Pendergrass had not shown that his ability to defend against the instant charges had been impaired by the delay, and found that his claim that the delay caused him to lose his opportunity to resolve both of his federal cases at the same time and obtain concurrent sentences was "speculative." (*Id.* at 10-11). It further determined that Mr. Pendergrass "failed to show that there was an intentional delay for the purpose of gaining a tactical advantage," while at the same time, denying Mr. Pendergrass's request for an evidentiary hearing on the issue. (*Id.* at 11 and n.2). The R&R found that the tactical advantages Mr. Pendergrass had alleged did not "amount to a tactical advantage at trial. (*Id.* at 12). Finally, the R&R found that Mr. Pendergrass's Sixth Amendment speedy trial rights were not "triggered" when he was arrested on the state charges. (*Id.* at 14-

Mr. Pendergrass filed objections to the R&R. (Doc. 156). The district court overruled the objections and adopted the findings and reasoning of the R&R. (Doc. 177).

ii.    Other acts evidence

Prior to trial, the government filed a motion *in limine* seeking to admit five uncharged acts and one prior conviction. (Docs. 71, 73.) The uncharged acts were related to checks in the names of Wiesman, Nowack, Curry, and Wilco, the Atlanta Quarterback Club, the Lee Family Trust, Holland and Knight, and Hemisphere, Inc.   (*Id.*). The prior conviction was a theft conviction from Fort Collins, Colorado related to an entity called Tousa Homes, pursuant to Rule 404(b).  (Doc. 73 at 4).

The government argued that these alleged "other acts" would be offered as elements of and/or were inextricably intertwined with crimes charged in the indictment. (Doc. 73 at 3). The government argued that these other acts were "necessary to complete the story of the charged conduct." (*Id.*).   Mr. Pendergrass argued that he was charged with five *substantive* counts of mail fraud, one count of money laundering conspiracy, and four counts of aggravated identity theft. (Doc. 191). He argued that none of the alleged other acts were inextricably intertwined with the very specific allegations in the indictment, nor did they "complete the story" of these specific acts.  (Doc. 191 at 16).

11

The district court found that these uncharged acts were admissible as intrinsic evidence because "the uncharged City of Atlanta offenses were 'linked in time and circumstances with the charged crime,' were part of the same scheme, and were inextricably intertwined." (Doc. 227 at 8). As to the Lee Family Trust, the Court noted that the "bad act" involved an alleged attempt to defraud Harris County, Texas and not the City of Atlanta, but found that "it also occurred in the same time span as the charged conduct and involved the same scheme, including the use of similar documents," and was thus admissible. (*Id.*). Mr. Pendergrass maintained his objections. (Doc. 235.)

iii.  <u>Trial</u>

A. <u>The investigation and charged conduct</u>

At trial, the government's first witness was former Investigator Douglas Ricks, who—by the time of trial—had retired from the Atlanta Police Department. (Doc. 263 at 22). He testified that the investigation in this case began when APD received reports of possible fraud against the City of Atlanta. (*Id.* at 25-26). After speaking with an employee of the city, Ricks investigated a P.O. box where the city had been sending checks that they believed were the result of fraud. (*Id.*). He obtained the application for the

P.O. box, and it listed Guishard Wilburn & Shorts as the business and Allen Pendergrass as the applicant. (*Id.* at 32). He also contacted Wells Fargo Bank and obtained images of the person cashing some of the checks. (*Id.* at 33-34). Ricks testified that the person depositing the checks appeared to be Mr. Pendergrass. (*Id.* at 34, 73-74).

Ricks later helped execute a search warrant for Asset Financial Recovery's office at 4854 Old National Highway on September 19, 2013. (*Id.* at 40). Mr. Pendergrass and McQueen were arrested at that location. (*Id.* at 43). There were other individuals inside the office working. (*Id.*). There were computers, printers, and other office equipment, and time cards for employees to sign in and out of the office. (*Id.* at 53-54). Law enforcement seized various documents from the office and several computers. (*Id.* at 42, 45-46, 71-72). The investigation was then turned over to the USPIS. (*Id.* at 49).

As to the charges in the indictment, James H. Bone and representatives from Actor's Express, and Johnson, Coleman, and Stephenson testified that they did not authorize Asset Financial to recover funds owed to them. (Doc. 263 at 95-99, 117-18, 122-23). The relevant documents for those requests to the City of Atlanta were all signed and sent by McQueen. (*Id.* at 96-97, 118, 125; Doc. 264 at 97).

The government called Ronald Bowers, a fraud investigator for Wells Fargo Bank to testify as a records custodian. (Doc. 263 at 126-27). Pursuant to a request from APD, Bowers produced images of checks and deposit slips. (*Id.* at 126-27, 131). Checks payable to Asset Financial in the care of (1) Long, Weinberg, Ansley, & Wheeler; (2) Georgia Municipal Association; (3) James H. Bone, trustee; (4) Actor's Express; and (5) Michael Burandt were deposited into a Wells Fargo business account for Asset Financial. (*Id.* at 135-141, 147). Mr. Pendergrass was listed as the owner of the account. (*Id.* at 147-48). Bowers pulled surveillance videos associated with some of the transactions, and images from those videos were admitted into evidence. (*Id.* at 141-143). In some of the footage, Mr. Pendergrass was with McQueen making the deposits. (*Id.* at 151-52, Doc. 264 at 175).

The government admitted a summary chart of the bank records from the Wells Fargo account through IRS Special Agent Wesley Cooper. (Doc. 265 at 183, 187-88). The chart showed, *inter alia*, a total of $201,343.28 in deposits from the City of Atlanta, $35,137 of payments to McQueen, $6,003 in payments to Dierdre Barber, and around $9,000 in cash withdrawals. (*Id.* at 189-90). There were also more than 15 checks paid out to state and county government agencies. (*Id.* at 191). Cooper also discussed the Bank of America

account, which showed checks paid to Mr. Pendergrass and McQueen, as well business expenses and "expenses like gas and food." (*Id.* at 193-94).

Eric Fitchpatric testified that he worked for Mr. Pendergrass at Asset Financial building websites. (Doc. 263 at 163-65). He worked at the office on Old National Road for six or seven months. (*Id.* at 167). Other people, including McQueen, Deidre Barber, Ashley Pendergrass, and a person named Joey, also worked at the office. (*Id.* at 169-70). At some point, Mr. Pendergrass and McQueen had Fitchpatric change the dates on some notary stamps using a photoshop program. (*Id.* at 175-76). He also photoshopped some signatures, but he did not know for what purpose. (*Id.* at 177-78). Fitchpatric was not charged with any crimes related to these activities. (*Id.* at 185).

B. Other acts evidence

The government called Gordon Giffin to testify about one of the uncharged acts. (Doc. 263 at 89). Giffin helped create Hemisphere, Inc., a nonprofit organization. (*Id.* at 90). Giffin testified that he did not authorize Guishard to collect funds on Hemisphere's behalf, and did not sign a letter of authorization to allow the company to do so. (*Id.* at 90). Similarly, Mr. Melvin Waller testified about another uncharged act involving the Atlanta

Quarterback Club. (*Id.* at 101). He did not authorize any company to collect money that was owed to the Atlanta Quarterback club from the City of Atlanta. (*Id.* at 102-03).

Michael Cohen, an attorney, was called to testify regarding the Lee Family Trust, another uncharged act. (Doc. 264 at 35). Cohen met with a person who introduced himself as Allen Pendergrass in 2013 at Cohen's office about employing him as an escrow agent for unclaimed funds that a business, Attorney Recovery, was attempting to collect from Harris County, Texas. (*Id.* at 36-38, 40). Cohen was given five or six checks from Harris County related to the Lee Family Trust, and he contacted the county and verified that the checks were legitimate. (*Id.* at 37-38). Cohen later learned that the Lee Family Trust had not given Attorney Recovery permission to obtain those checks. (*Id*. at 38-42, 48-49). Cohen returned the funds to Harris County. (*Id.* at 42).

C. Co-defendant McQueen's testimony

Mr. Pendergrass's codefendant, Terrell McQueen, testified pursuant to his plea agreement with the government. (Doc. 264 at 65; Doc. 265 at 88-90). Prior to working with Mr. Pendergrass, McQueen was an account with Clark Atlanta University. (Doc. 264 at 68). In 2006, he started doing accounting

and bookkeeping work for Mr. Pendergrass' asset recovery business. (*Id.* at 69-71). He was only there a few months, but he returned to work with Mr. Pendergrass in his cell phone business in for some time 2010. (*Id.* at 72-73). In 2012, McQueen approached Mr. Pendergrass about starting the asset collection business again. (*Id.* at 76-77).

McQueen and Mr. Pendergrass started working under the name Asset Financial Recovery. (*Id.* at 77). Mr. Pendergrass gave McQueen a list of unclaimed or uncashed checks from counties and municipalities, and McQueen attempted to contact the people or business that were owed money to get permission to collect the money on their behalf in exchange for a portion, usually 33 percent. (*Id.* at 79-81). McQueen got the entire 33 percent fee for any deal that he closed. (*Id.* at 82). McQueen testified that he was successful in this business at first. (*Id.* at 81). Mr. Pendergrass taught him how to talk to potential clients to convince them to let the business collect money for them. (Doc. 265 at 67). Mr. Pendergrass told him "it is a numbers game," and that "if you send out enough letters the legitimate way . . you would get at least two or three people that would sign up." (*Id.* at 69).

McQueen claimed that he and Mr. Pendergrass started forging signatures to get money that they were not entitled to after some

unsuccessful attempts to collect money legitimately; they determined people "didn't want the money." (Doc. 264 at 83, 151). McQueen testified that this started with an attempt to collect on behalf of Holland & Knight. (*Id.*). He said that Attorney Recovery Systems was formed to obtain those funds. (*Id.* at 84). Holland & Knight was owed $359,000, and they agreed that McQueen would keep $150,000 and Mr. Pendergrass would get a larger share because he had obtained the list of unclaimed funds. (*Id.* at 84-86). McQueen testified that he and Mr. Pendergrass each forged signatures on the relevant documents, and Fitchpatric added an altered notary seal. (*Id.* at 86-87).

McQueen opened an account in his own name, but doing business as Holland & Knight, deposited the check, and wrote himself a check for $40,000. (*Id.* at 96-97). He then withdrew $10,000 of that in cash. (*Id.* at 97). The City of Atlanta later attempted to contact McQueen about this, but he did not respond. (*Id.* at 100-01). Eventually, McQueen learned that he was going to be arrested in Clayton County for deposit fraud, and he could settle the case by paying $16,000 back to SunTrust Bank. (*Id.* at 101). McQueen testified that Mr. Pendergrass told him they would be able to make the money back with the Lee Family Trust account. (*Id.* at 101-02). McQueen was

anxious to make more money because he "did not want to go to jail."  (*Id.* at 154-55, 161).

After McQueen was unsuccessful in depositing the Holland & Knight funds in his own account, he went with Mr. Pendergrass and Barber to open a business account at Bank of America to make deposits. (*Id.* at 172). Mr. Pendergrass was the only one who could write checks or withdraw money from that account. (*Id.* at 171-72).

McQueen testified that he also forged signatures to collect for Weismann, Novack, and Curry.  (*Id.* at 91).  He said that he and Mr. Pendergrass worked together on the Johnson, Coleman, and Stephenson account, but McQueen forged all of the signatures. (*Id.* at 93-94).  McQueen further testified that he and Mr. Pendergrass "fraudulently obtained" funds owed to the Glenridge Drive Group, another act not charged in the indictment. (*Id.* at 110-11). McQueen tried to contact someone from the Glenridge Drive group to persuade them to hire the company before he resorted to fraud. (*Id.* at 141).

Similarly, McQueen testified that he also tried to contact Lydia Walker before asking Mr. Fitchpatric to photoshop a notary stamp to fraudulently obtain funds owed to her. (*Id.* at 144-147).  He did the same for Mr. Waller

and the Atlanta Quarterback account. (*Id.* at 168-70). McQueen also created the documents for the Long, Weinberg, Ansley, & Wheeler account. (*Id.* at 153). Likewise, McQueen contacted James H. Bone, and when Bone told him the money didn't belong to him, McQueen obtained it by fraud. (*Id.* at 161-62). McQueen testified that Mr. Pendergrass forged one on the signatures on the James H. Bone documents. (*Id.* at 162). McQueen gave similar testimony related to Actor's Express and the Georgia Municipal Association. (*Id.* at 148-49, 164-66). However, McQueen claimed that, as a general matter, he "discussed everything" with Mr. Pendergrass before submitting any claims to the city. (*Id.* at 154-55).

McQueen also discussed Tousa Homes, another uncharged act. (*Id.* at 199-206). The Tousa Homes account was out of Colorado and did not involve the City of Atlanta. (*Id.* at 200). McQueen testified that he and Mr. Pendergrass created the documents for that account together, but he did not receive any proceeds from it. (*Id.* at 201). He said that Mr. Pendergrass obtained a phone number to pose as Tousa Homes and they set up a voicemail to make it appear that the number was for that business. (*Id.* at 205-06).

McQueen testified that Mr. Pendergrass had three or four fake IDs in his desk, and they would have Mr. Fitchpatric change the names on the IDs to that of the individual they were submitting claims for. (*Id.* at 212-23).

McQueen also testified about the Lee Family Trust account. (*Id.* at 216-233). He said he helped create the documents for that account. (*Id.* at 216). For that account, McQueen and Mr. Pendergrass used the Attorney Recovery System business name, as McQueen had for Holland & Knight. (*Id.* at 263-64). McQueen testified that he attended the meeting with Cohen where they discussed using Cohen's trust account. (*Id.* at 220-21). McQueen set up a P.O. Box that only he controlled to receive the checks from Harris County. (*Id.* at 223-24). Those checks totaled $173,000. (*Id.* at 224).

McQueen admitted that the business also had "legitimate deals" that did not involve fraud, including accounts with the Fryer Firm, Roshaunta Redmond, and Michael Burandt. (*Id.* at 188-94, 206-08). The Fryer Firm and Roshaunta were paid, and the business kept their agreed-upon portion in exchange for collecting the money; McQueen did not know whether Burant was paid. (*Id.* at 191-92, 208-09). He estimated that about 10 percent of the money the business made was legitimate. (Doc. 265 at 61-62). McQueen testified that "the intention was not to steal money," but he "didn't think

[he] had time or could close enough deals to pay back that 16 grand from SunTrust." (Doc. 264 at 194).

Mr. McQueen admitted that, after he was arrested by APD, he, on his own, fraudulently obtained money owed to Pensacola Ice Pilots from Escambia County, Florida without Mr. Pendergrass's involvement. (Doc. 265 at 78-79).

Before cross-examination, a stipulation was read to the jury indicating that the government had previously represented in court documents that the specific counts alleged in the indictment involved incidents where co-defendant McQueen signed and sent the alleged forged documents at issue, not Mr. Pendergrass. (*Id.* at 97).

Mr. Pendergrass was found guilty of all counts. (*Id.* at 120-21).

iv.    <u>Motion for New Trial and Renewed Motion for Judgment of Acquittal</u>

After trial, Mr. Pendergrass filed a renewed motion for judgment of acquittal and a motion for new trial. (Docs. 267, 268). In the motion for new trial he argued, *inter alia*, that he was unfairly prejudiced by the introduction of copious amounts of evidence of uncharged conduct that rendered the verdicts on the actual charges unreliable, such that the interests of justice

require a new trial. (*See generally* doc. 268).  The district court denied both motions. (Doc. 285).

    v.    <u>Sentencing</u>

The probation officer prepared at presentence investigation report ("PSR") and calculated the guidelines as follows. For the mail fraud counts, Counts 1-5, the base offense level was 7, pursuant to U.S.S.G. § 2B1.1. (PSR at ¶ 36).  Then 14 levels were added for the amount of loss. (*Id.* at ¶ 37). Pursuant to § 2B1.1(b)(10)(C), 2 levels were added because the offense involved sophisticated means. (*Id.* at ¶ 38). Another 2 levels were added pursuant to § 2B1.1(b)(11)(A)(ii) for use of an authentication feature; specifically, "the offense involved the defendants placing photoshopped signatures and notary seals on power of attorney forms."  (*Id.* at ¶ 39).  The PSR then added 4 points, pursuant to § 3B1.1(a), for leadership role.  (I*d.* at ¶ 41).  This yielded an offense level of 29 for Counts 1-5.  (*Id.* at ¶ 43).

For Count 6, money laundering conspiracy, the PSR started with a base offense level of 23, pursuant to § 2S1.1.  (*Id.* at ¶ 44). Then two points were added for the 18 U.S.C. § 1956 conviction, two levels for "sophisticated laundering," pursuant to § 2S1.1(b)(3), and four levels for leadership role. (*Id.* at ¶ 45, 48).  This yielded a total offense level of 31. (*Id.* at ¶ 55). For the

aggravated identity theft counts, the guideline sentence was the term of imprisonment required by statute, two years. (*Id.* at ¶ 56).

Mr. Pendergrass had a criminal history score of three based on his conviction in the Southern District of Ohio, which established a criminal history category of II. (*Id.* at ¶¶ 62, 64, 65). The higher of the total offense levels—the level 31 for the money laundering conspiracy—and the criminal history category of II yielding a guideline range of 121 to 151 months, plus 24 months consecutive for the aggravated identity theft counts. (*Id.*).

Mr. Pendergrass filed objections to the PSR. (*See* PSR addendum). Relevant here, he objected to the amount of loss, (PSR addendum at ¶¶ 4-8), the enhancements for sophisticated means and sophisticated laundering, (*id.* at ¶ 10), the enhancement for use of an authentication feature (*id.* at ¶ 11), and the enhancements for leadership role, (*id.* at¶ 12). The government did not file any objections to the PSR, but it agreed with Mr. Pendergrass that the enhancement for sophisticated laundering should not apply. (*Id.* at 1; Doc. 316 at 4). The government also recommended a two-point enhancement for leadership rather than the four-point enhancement in the PSR, and recommended a different loss amount. (Doc. 316 at 4-5).

24

At the sentencing hearing, the court started with Mr. Pendergrass's objection to the enhancement for use of an authentication feature. (Doc. 316 at 8). Mr. Pendergrass explained that the enhancement could not be applied because he was convicted of aggravated identity theft, and the guidelines instructed that the specific offense enhancements for the mail fraud should not be applied in that situation, citing U.S.S.G. § 2B1.6 comment n.2. (*Id.* at 8-9). After hearing from both parties, the court overruled Mr. Pendergrass's objection. (*Id.* at 63-64). The court apparently agreed with the government that the signatures on the power of attorney forms made them identification documents, or a means of identification, and the attached notary seals were a separate authentication feature. (*Id.* at 10-13, 63-64).

As to the leadership enhancement, the court overruled Mr. Pendergrass's objection and applied the two-point enhancement pursuant to U.S.S.G. § 3B1.1(c). (*Id.* at 23). The court then heard argument on the amount of loss, and determined that Mr. Pendergrass was responsible for $221,298.36 (*Id.* at 25-66).

Accordingly, the court's calculation of the guidelines was as follows. For the bank fraud counts, the base offense level was 7, with 10 added for the loss amount, 2 for the authentication feature, 2 for sophisticated means,

and 2 for the role. (*Id.* at 65-66). This yielded a total offense level of 23 for those counts. (*Id.* at 66). For the money laundering count, the base offense level was 21, with 2 added for being convicted under § 1956, and 2 added for role, for a total of 25. (*Id.* at 66, 75). The final guideline range was 63 to 78 months, plus 24 months consecutive, for a total of 87 to 102 months. (*Id.*). Mr. Pendergrass was sentenced to a total term of 46 months. (*Id.* at 92). In imposing the sentence, the court specifically noted that it had "strongly considered the guidelines." (*Id.* at 93).

This appeal followed.

## STANDARDS OF REVIEW

Legal questions relating to a defendant's claim of a constitutional violation are reviewed *de novo. United States v. Van De Walker*, 141 F.3d 1451, 1452 (11th Cir. 1998).

This Court reviews the district court's evidentiary rulings, including the admission of uncharged acts evidence, for an abuse of discretion. *United States v. Ford*, 784 F.3d 1386, 1392 (11th Cir. 2015).

This Court reviews the sufficiency of the evidence *de novo.* *United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016).

This Court reviews the district court's application of the Sentencing Guidelines de novo and its findings of fact for clear error. *United States v. Smith*, 231 F.3d 800, 806-07 (11th Cir. 2000).

This Court reviews the district court's denial of a defendant's right to allocute at sentencing for plain error when the defendant failed to object before the district court. *United States v. Doyle*, 857 F.3d 1115, 1118 (11th Cir. 2017).

## SUMMARY OF THE ARGUMENT

The nearly four-year delay in indicting Mr. Pendergrass violated his Fifth and Sixth Amendment rights, and the district court erred in denying his motion to dismiss the indictment on this basis.  There was clearly a coordinated effort between authorities in Fulton County and the government to arrest Mr. Pendergrass on charges that Fulton County never intended to prosecute. Instead, the state case was merely a ruse designed to give the government an advantage at trial and ensure that Mr. Pendergrass would face consecutive sentences in different districts and remain under supervision in Georgia until he was finally prosecuted in this case.  Mr. Pendergrass suffered actual prejudice from the government's tactical maneuver, but even absent that, prejudice must be presumed given the length and cause of the delay.

There was insufficient evidence to sustain the convictions for two of the aggravated identity theft counts, Counts 7 and 8.  Mr. Pendergrass's codefendant McQueen testified that he forged the signatures on the relevant documents, and there was no evidence that Mr. Pendergrass had knowledge of McQueen's actions before he took them.

The district court abused its discretion by admitting evidence related to the Lee Family Trust, Holland & Knight, and Tousa Homes. While the court found that these acts were intrinsic to the charged offenses, these uncharged acts were too different from the charged conduct to be considered intrinsic, and they were not necessary to complete the story of the charged offenses.  While the probative value of this evidence was extremely limited, the unfair prejudice to Mr. Pendergrass was extreme due to the large amounts of money involved and the more sophisticated schemes used to obtain that money.

In sentencing, the district court erred by applying the two-point enhancement for use of an authentication feature.  Because the same conduct was the subject of the aggravated identity fraud counts, the enhancement constituted double counting and was barred by the applicable guideline commentary.  Finally, the district court plainly erred when it failed to give Mr. Pendergrass an opportunity to allocute in support of a lower sentence.

<u>ARGUMENT AND CITATIONS OF AUTHORITY</u>

I.    <u>The nearly four-year delay in indicting Mr. Pendergrass violated his
      Fifth and Sixth Amendment rights, and the district court erred in
      denying his motion to dismiss the indictment on this basis.</u>

Nearly four years passed between Mr. Pendergrass's arrest by state
authorities and the indictment in this case, even though both federal and
state authorities knew at the time of the arrest that the federal government
was planning to prosecute him. (*See* Doc. 152 at 4). Although state authorities
arrested Mr. Pendergrass, they never brought charges against him. (*Id.* at 4-
6). The federal government waited nearly four years after that arrest, until
after Mr. Pendergrass had served another federal sentence for similar
offenses, to finally indict him based on the same conduct he was arrested for
in 2013. (*Id.* at 4-7).

This inordinate and calculated delay violated Mr. Pendergrass's Fifth
Amendment due process rights and his Sixth Amendment right to a speedy
trial. Mr. Pendergrass submits that the available evidence is sufficient for
this Court to find a constitutional violation mandating dismissal of the
indictment, but in the event the Court disagrees, the Court should remand
to the district court for an evidentiary hearing on the matter.

A. <u>The pre-indictment delay of nearly four years violated Mr. Pendergrass' Fifth Amendment due process rights.</u>

While the limit on pre-indictment delay is generally set by the statute of limitations, the Due Process Clause of the Fifth Amendment may bar an indictment even when it is brought within the limitation period. *See United States v. Lovasco*, 431 U.S. 783, 788–91 (1977); *United States v. Marion*, 404 U.S. 307, 324 (1971). For a due process bar to apply, the defendant must show that the pre-indictment delay (1) was the product of deliberate action by the government taken in order to gain a tactical advantage, and (2) caused actual prejudice to the conduct of his defense. *Stoner v. Graddick*, 751 F.2d 1535, 1541-42 (11th Cir. 1985).

i. <u>The delay was a deliberate action by the government calculated to gain a tactical advantage.</u>

Here, the timeline of events alone is enough for this Court to conclude that the government's delay in indicting Mr. Pendergrass was a deliberate action taken to gain a tactical advantage, when all of the evidence shows, and the government admits, that the case was intended to be prosecuted federally from the time of his arrest.

The government did not argue that the nearly four-year delay was due to any continuing investigation. In fact, it conceded that the same allegations

31

and same charges that were being considered in 2013 were the allegations and charges submitted to the federal grand jury in 2017. (*See* doc.152 at 6-7) The government even conceded that the case was "adopted" from state authorities as early as the spring of 2014. (*Id.* at 5). Furthermore, the fact that the Fulton County District Attorney's Office had no files related to Mr. Pendergrass shows that the state never intended to prosecute Mr. Pendergrass. (*See* doc. 143-5). Accordingly, the delay here was clearly a tactical move by the government.

The government certainly sought to use the delay to its advantage. It intended to bolster its weak case against Mr. Pendergrass by attempting to admit evidence of his prior conviction in other districts. (*See* doc. 73). These convictions all happened *after* the APD and U.S. Postal Service raided his office and arrested him back in 2013. While the district court found no prejudice from this use of this 404(b)evidence, echoing the government's claim that it could have used the evidence even if it had not secured a conviction in another district, it cannot be denied that the weight of a *conviction* on unrelated fraud charges is much greater than mere allegations.

Further, the calculated effort to divide the allegations related to Mr. Pendergrass' businesses to be tried in different jurisdictions at different

times ensured that Mr. Pendergrass would serve the maximum amount of time for each alleged crime. As a result of the pending Fulton County case, he was unable to receive the benefits of early release after serving his sentence in another federal district, even though the BOP was prepared to release him to a half-way house. He also lost the opportunity to argue for concurrent sentences in these cases.

As the district court recognized, the APD and USPIS worked together to arrest Mr. Pendergrass and seize all of his business documents and property. APD, US Postal Service, the US Attorney's Offices in various districts, and the Fulton County District Attorney's Office were in contact with each other about Mr. Pendergrass and the allegations presented here for many years before the indictment was sought in this case. Indeed, Postal Inspector Kermie Green and APD Detective Ricks were listed as witnesses in the cases in other states and federal districts.

Keeping the Fulton County case open and pending since 2013, without indictment, permitted the prosecution of Mr. Pendergrass in other districts, where the allegations were older and may have triggered statute of limitations concerns had they been delayed, but still ensured that a hold remained on him in Georgia. Thus, the government ensured he could not be

33

released from prison without returning – in custody – to Atlanta. Therefore, it is clear that the government gained an advantage, or at least sought to gain an advantage, by delaying the case.

     ii.    <u>Mr. Pendergrass was prejudiced by the intentional delay.</u>

The government's tactical delay in this case had the result that was intended: he was prejudiced by the nearly four-year delay in bringing the indictment.  In addition to the 404(b) evidence and the additional prison time discussed above, Mr. Pendergrass was disadvantaged by the delay in prosecution because he did not know to begin preparing his defense or working with a lawyer to defend these 2013 allegations until the federal indictment was brought in 2017.  Although he was arrested in 2013, it appeared that the county was not going to prosecute him in the spring of 2014, when he was released from pre-trial supervision in Fulton County because it did not appear the county was going to prosecute him.  From that point forward, there was no need for Mr. Pendergrass to try record important facts or events because he was not on notice of any prosecution. The prejudice from this, the additional prison time, and the 404(b) evidence, is sufficient for this Court to find a due process violation compelling dismissal of the indictment.

34

B. <u>The pre-indictment delay of nearly four years violated Mr. Pendergrass' Sixth Amendment speedy trial right.</u>

The Sixth Amendment provides the right to a speedy trial to the accused in all criminal prosecutions. U.S. CONST. AMEND. VI. Federal Rule of Criminal Procedure 48 permits a court to dismiss an indictment if "unnecessary delay" occurs in presenting a charge to the grand jury or bringing a defendant to trial. Fed.R.Crim.P. 48(b)(1), (b)(3). Dismissal is mandatory if the defendant's constitutional rights have been violated. *United States v. Knight*, 562 F.3d 1314, 1324. (11th Cir. 2009). A defendant's rights under the Speedy Trial Clause of the Sixth Amendment are triggered by "either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge." *Marion,* 404 U.S. at 320.

i. <u>This Court should find that Mr. Pendergrass's speedy trial right was triggered when he was arrested in September of 2013.</u>

Generally, the speedy trial clock for a federal case is not started until there is a formal indictment in federal court or actual restraint by federal authorities, as opposed to an arrest by state authorities. *See United States v. MacDonald,* 456 U.S. 1, 10 n.11 (1982). However, some federal courts have recognized an exception, known as the "ruse" exception, "when the [federal

g]overnment has knowledge that an individual is held by state authorities solely to answer to federal charges." *United States v. Woolfolk*, 399 F.3d 590, 596 (4th Cir. 2005); *see also United States v. Clark*, 754 F.3d 401, 405-06 (7th Cir. 2014) (ruse exception may be possible if defendant has evidence of agency between federal and state authorities); *United States v. Benitez*, 34 F.3d 1489, 1494 (9th Cir. 1994) ("Speedy Trial Act time periods may be triggered by state detentions that are merely a ruse to detain the defendant solely for the purpose of bypassing the requirements of the Act.").

Mr. Pendergrass acknowledges that in *Woolfolk* and *Clark* the defendants were held by state authorities due to a federal detainer. However, the fact that no federal detainer was lodged in Mr. Pendergrass's case should be controlling here, where federal agents where involved in the case at the time of his arrest, evidence was turned over to federal authorities, state investigators acknowledged that the case was going to be indicted by federal authorities, and, perhaps most importantly, no state case charges were ever lodged.  As the Ninth Circuit stated in *Benitez*, the right to a speedy trial "would lose all force if federal criminal authorities could arrange with state authorities to have the state authorities detain a defendant until federal authorities are ready to file criminal charges."  *Benitetz*, 34 F.3d at 1494.

36

This Court has recognized the "ruse" exception in the context of a federal immigration detention: "While routine INS detentions incident to deportation will not trigger the Speedy Trial Act, a contrary result may be warranted when deportations are used by the government as 'mere ruses to detain a defendant for later criminal prosecution.'" *United States v. Drummond*, 240 F.3d 1333, 1336 (11th Cir. 2001) (quoting *United States v. Noel*, 231 F.3d 833, 836 (11th Cir. 2000)). Other circuits have also recognized this exception in the same context. *See United States v. Guevara-Umana*, 538 F.3d 139, 142 (2d Cir. 2008); *United States v. Pasillas-Castanon*, 525 F.3d 994, 997 (10th Cir. 2008); *United States v. Garcia-Martinez*, 254 F.3d 16, 20 (1st Cir. 2001); *United States v. De La Pena-Juarez*, 214 F.3d 594, 598 (5th Cir. 2000). The reasoning behind these cases applies with full force here.

Indeed, while it appears that this Court has not previously applied the ruse exception in this context, this Court's precedent supports Mr. Pendergrass's position. In *United States v. Nixon*, 634 F.2d 306, 309 (5th Cir. 1981),[1] the Court stated the following:

> It is clear . . . that "(for) purposes of determining when the right to speedy trial attaches the basis for the arrest is critical." *Gravitt*

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*v. United States*, 523 F.2d 1211, 1215 n.6 (5th Cir. 1975) (emphasis in original). In *Gravitt*, petitioner was initially arrested on a state warrant charging armed robbery and assault. A search incident to the arrest revealed a large number of firearms. Some time later, a formal complaint and arrest warrant were filed by federal officials charging him with interstate transportation of firearms by a convicted felon. When the speedy trial question was presented, the Court focused on the basis of the arrest and held that the time was not to be measured from the time of the initial arrest but from the time the petitioner was accused of the crime he was then challenging. The cases of *United States v. DeTienne*, 468 F.2d 151 (7th Cir. 1972), cert. denied, 410 U.S. 911 (1973), and *United States v. Cabral*, 475 F.2d 715 (1st Cir. 1973), also make it clear that the basis of the arrest is critical.

Of course, if the second charge is but a part of or only gilds the initial charge, the initial arrest would start the critical period for trial. As the Seventh Circuit observed in *DeTienne*:

> (If) the crimes for which a defendant is ultimately prosecuted really only gild the charge underlying his initial arrest and the different accusatorial dates between them are not reasonably explicable, the initial arrest may well mark the speedy trial provision's applicability as to prosecution for all the interrelated offenses.  468 F.2d at 155.

*Nixon*, 634 F.2d at 309 (cleaned up).

The facts available demonstrate that the federal prosecution here merely gilded the charge underlying his state arrest, and that the state case served as a ruse for the federal prosecution, such that the speedy trial clock started running at the time of Mr. Pendergrass' September 2013 arrest.

ii.  <u>Consideration of the *Barker* factors compels the conclusion that Mr. Pendergrass's constitutional speedy trial right was violated.</u>

In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court set out a four-factor test for determining whether delay between the initiation of criminal proceedings and the beginning of trial violates a defendant's Sixth Amendment right to a speedy trial. The test requires the court to consider the length of the delay, the cause of the delay, the defendant's assertion of his right to a speedy trial, and the presence or absence of prejudice resulting from the delay. *Barker*, 407 U.S. at 530-533.  *Barker* notes three concerns that the Sixth Amendment right to a speedy trial is designed to protect, (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. *Id.* at 532.

"A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government." *Id.* at 531. "In cases of government negligence, [the Court's] concern for substantiating prejudice decreases as the period of delay increases." *United States v. Ingram*, 446 F.3d 1332, 1338 (11th Cir. 2006).  Delays exceeding one year are generally found to be presumptively prejudicial. *Id.* at 1336. If the first three factors weigh

heavily against the government, the defendant is not required to show actual prejudice to show a constitutional speedy trial violation. *Id.*

In *Doggett v. United States*, 505 U.S. 647 (1992), the Supreme Court held that an "extraordinary" 8.5 year delay between the defendant's indictment and his arrest, which resulted from the government's "egregious persistence in failing to prosecute" violated his right to a speedy trial even in the absence of particularized prejudice. 505 U.S. at 652, 655, 657. As noted in Justice White's concurring opinion:

> [I]nordinate delay between public charge and trial, . . . wholly aside from possible prejudice to a defense on the merits, may seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.

407 U.S. at 531 (White, J, concurring).

Here, consideration of the *Barker* factors compels the conclusion that Mr. Pendergrass's Sixth Amendment rights were violated. The first two *Barker* factors—the length and cause of the delay—indisputably weigh in Mr. Pendergrass's favor. Indeed, the delay of almost four years is far greater that the one-year delay that this Court has found to be presumptively prejudicial. *Ingram*, 446 F.3d at 1336. As shown above, the delay here was a deliberate

attempt by the government to gain a tactical advantage, so this factor also weighs "heavily" against the government. *See Barker*, 407 U.S. at 531. Mr. Pendergrass was unable to assert his right to a speedy trial during the time that the government failed to indict him in federal court, but he asserted his rights once competent counsel was appointed. Thus, the first three *Barker* factors weigh in Mr. Pendergrass's favors, and substantially so.

Because the first three Barker factors weigh heavily against the government, Mr. Pendergrass should not be required to show actual prejudice to show a constitutional speedy trial violation. *Ingram*, 446 F.3d at 1336; *see also Barker*, 407 U.S. at 531 (because the delay here was "a deliberate attempt to delay the trial in order to hamper the defense" this factor should be weighted "heavily against the government."). Indeed, given the lengthy delay of four years, this Court should be less concerned with Mr. Pendergrass' need to prove actual prejudice. *See Ingram*, 446 F.3d at 1336. Instead, the less concrete prejudice that Justice White described in *Doggett*—disruptions in employment, strains on financial resources, anxiety in Mr. Pendergrass as well as his family and friends—is sufficient to find a Sixth Amendment violation where, as here, the delay was extraordinary in length and caused by a tactical decision by the government.

41

Indeed, *Barker* specifically held that the sort of the prejudice that Mr. Pendergrass suffered here was exactly the sort that the Sixth Amendment right to a speedy trial was designed to prevent. *See Barker*, 407 U.S. at 532. In addition to the anxiety the delay caused, Mr. Pendergrass was prevented from going to a halfway house at the end of his Ohio sentence as a result of the coordination between Fulton County authorities and federal authorities. *See id.* (noting that the speedy trial right is designed to prevent oppressive pretrial incarceration.). He was subject to pretrial release in Fulton County for six months, during which time he could not leave the Atlanta metro area without permission. (Doc. 107 at 12 and attachment 1). He had a "24 hour curfew," which meant he was restricted to his house most of the time. (*Id.*). He was subject to urine testing and he was required to wear an ankle monitor, and he was required to take classes as part of his pretrial release. (*Id.*). All for a case that the state never intended to prosecute. Thus, even if prejudiced was not presumed, Mr. Pendergrass has shown real harm from the delay.

Accordingly, this Court must find that Mr. Pendergrass's constitutional right to a speedy trial was violated, vacate his convictions, and order that the indictment be dismissed.

C. Alternatively, this Court should remand to the district court for an evidentiary hearing.

Mr. Pendergrass requested an evidentiary hearing in this matter numerous times, but his requests were denied. If this Court determines that he has not sufficiently demonstrated that this Fifth and Sixth Amendment rights were violated, this Court should remand the case for an evidentiary hearing.

The district court faulted Mr. Pendergrass for "not present[ing] any specific and concrete evidence as to prejudice or as to bad faith tactical manever[ing] on the part of the Government," (doc. 177 at 4), but it did not give Mr. Pendergrass the opportunity to do so, despite his repeated requests. It is nearly impossible for Mr. Pendergrass to make a further showing of deliberate delay and resulting prejudice when all of the evidence regarding the reasons for the delay is in the hands of the government, the Fulton County District Attorney's Office, and the Atlanta Police Department.

While Mr. Pendergrass attempted to gather evidence supporting his position, the Fulton County District Attorney's Office and APD had failed to provide other documentation requested in subpoenas and failed to respond to inquiries from Mr. Pendergrass's attorney. (Doc. 143 at 6-7). Because there was no hearing, no one from these offices or the United States government

provided testimony under oath in the matter. If given the opportunity to present evidence at an evidentiary hearing, Mr. Pendergrass could use the power of the subpoena to force someone to testify under oath and to provide the requested materials.

Mr. Pendergrass should get the opportunity to submit evidence in support of his claims, and he has made a sufficient showing to be entitled to that opportunity. This Court must remand to the district court for a hearing on the matter.

II. <u>There was insufficient evidence to sustain the convictions for Counts 7 and 8, which charged aggravated identity theft.</u>

To prove a violation of 18 U.S.C. § 1028A, the evidence must establish that the defendant: (1) knowingly transferred, possessed, or used (2) the means of identification of another person; (3) without lawful authority; (4) during and in relation to a felony enumerated in § 1028A(c). *United States v. Barrington*, 648 F.3d 1178, 1192 (11th Cir. 2011) (quotation and footnote omitted). The federal aiding and abetting statute, 18 U.S.C. § 2, states that a person who "aids, abets, counsels, commands, induces or procures"—the commission of a federal offense "is punishable as a principal." A person "aids and abets a crime when (in addition to taking the requisite act) he

intends to facilitate that offense's commission." *Rosemond v. United States*, 572 U.S. 65, 76 (2014).

In *Rosemond*, the Supreme Court examined the "compound" offense of using or carrying a firearm while committing certain violent or drug-related crimes. 572 U.S. at 71. The Court applied basic complicity principles to hold that a person does not automatically aid and abet a § 924(c) violation just because he intentionally assists the underlying crime. 572 U.S. at 75-77. Instead, he must intend to assist the § 924(c) violation itself—gun use included. *Id.* at 76. In the Court's words, "the intent must go to the specific and entire crime" for which the person is charged as an aider and abettor. *Id.* In a § 924(c) case, that requirement is met if the person "actively participated in the underlying crime with advance knowledge that a confederate would use or carry a gun during [its] commission." *Id.* at 67.

Like the offense at issue in *Rosemond*, aggravated identify theft is also a compound offense: it punishes the use of another person's means of identification during and in relation to certain felony offenses. 18 U.S.C. § 1028A. Applying the principles from *Rosemond*, the Sixth Circuit Court of Appeals has held that "aiding and abetting aggravated identity theft requires the intent to assist the *identity theft*, not just the underlying offense.

. . such intent must include (at a minimum) 'advance knowledge' of the identity theft. After all, you can't intentionally assist an identity theft that you only learn about after it's been committed." *United States v. Chavez*, 951 F.3d 349, 362 (6th Cir. 2020) (emphasis in original).

Here, there was no evidence of how Mr. Pendergrass allegedly assisted McQueen in transferring, possessing, or used another person's means of identification as to Counts 7 (Sonia Johnson) and 8 (Lou Comer). Further, the government failed to prove beyond a reasonable doubt that Mr. Pendergrass had advance knowledge of McQueen's identity theft at the time it occurred, or that he specifically intended to participate in this crime.

As to Count 7, McQueen testified that he signed Sonia Johnson's name, he printed her name, and all of the handwriting on the relevant document was his. (Doc. 264 at 95). Likewise, as to Count 8, McQueen testified that he searched for Lou Comer's information online, he transferred the Georgia Municipal Association seal from the internet, he created the fake business card, he signed Comer's name, and he photoshopped the notary seal and signature. (*Id.* at 148-49). There was no testimony that McQueen and Mr. Pendergrass discussed these specific actions by McQueen before he undertook them.

While the district court, in denying Mr. Pendergrass's renewed motion for judgment of acquittal, pointed to the fact that the checks for Johnson, Coleman, and Stephenson account and the Georgia Municipal Association were sent to the P.O. box controlled by Mr. Pendergrass and there was footage of him depositing those checks, (doc. 285 at 3-4), this evidence does not show that Mr. Pendergrass had advance knowledge of McQueen's actions.    Indeed, these facts do not show that Mr. Pendergrass had knowledge of the identity theft even at the time that he deposited the checks, as there was evidence that the business obtained at least some checks legitimately and not through fraud. As such, there is no evidence that Mr. Pendergrass aided and abetted McQueen in these offenses, and Mr. Pendergrass's convictions on Counts 7 and 8 must be vacated.

III.    <u>The district court abused its discretion by admitting evidence of uncharged acts that was more prejudicial than probative.</u>

Rule 404(b) of the Federal Rules of Evidence provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a [defendant]'s character in order to show that on a particular occasion the person acted in accordance with the character." Evidence of uncharged conduct is admissible, however, "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of

47

mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Thus, for such evidence

to be admissible under Rule 404(b),

> (1) it must be relevant to an issue other than defendant's character;
> (2) there must be sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question; and
> (3) the probative value of the evidence cannot be substantially outweighed by undue prejudice, and the evidence must satisfy Rule 403.

*United States v. Edouard,* 485 F.3d 1324, 1344 (11th Cir. 2007).

Evidence of other crimes, wrongs, or acts "falls outside the scope of

Rule 404(b) but is independently admissible" if the act, (1) arose out of the

same transaction or series of transactions as the charged offenses, (2) is

necessary to complete the story of the crime, or (3) is inextricably intertwined

with the evidence regarding the charged offenses. *United States v. Ford*, 784

F.3d 1386, 1393 (11th Cir. 2015).  Like all evidence, Rule 404(b) evidence and

intrinsic evidence is only admissible if the probative value of the proffered

evidence is not substantially outweighed by unfair prejudice.  Fed. R. Evid.

403.

Here, the district court allowed the government to present an array of

uncharged acts evidence.  The evidence regarding the Lee Family Trust,

Holland & Knight and Tousa Homes though, was not intrinsic to the charged

offenses, was not admissible under 404(b), was unduly prejudicial, and was so pervasive that it overshadowed the actual charges in the case.

A. <u>Lee Family Trust</u>

The Lee Family Trust evidence had little connection to the fraud alleged in the indictment and thus should not have been admitted as intrinsic evidence. *See Ford*, 784 F.3d at 1393.[2] First, the incident involved funds from Harris County, Texas, not the City of Atlanta. Thus, the evidence was not a part of the series of transactions alleged in the indictment, which all involved payments from the City of Atlanta. For the same reason, the government could have easily told the "complete story" of the alleged fraud on the City of Atlanta without this evidence. While the government at times indicated that it needed to explain *every transaction* in Mr. Pendergrass's bank accounts, (*see* doc. 264 at 113), it certainly did not do so; making its contention that the Lee Family Trust evidence was necessary for this reason disingenuous.

---

[2] The Third Circuit has held that evidence is intrinsic only if it directly proves the charged conduct, or if the uncharged acts performed contemporaneously with the charged crime facilitated the commission of the charged crime. *United States v. Green*, 617 F.3d 233, 248-49 (3d Cir. 2010) (en banc). The Seventh Circuit has also rejected the inextricably intertwined option. *United States v. Gorman*, 613 F.3d 711, 719 (7th Cir. 2010). This Court should adopt that position.

Moreover, the alleged fraud involved in the Lee Family Trust incident was different than the conduct alleged in the indictment. It involved using an attorney, Mr. Cohen, in an attempt to obtain the Lee Family Trust funds, something that was not alleged in the procurement of the City of Atlanta Funds. It also involved much more money than any of the five acts alleged in the indictment: McQueen testified that he received $173,000 in checks for the Lee Family Trust, over twice the largest sum in the indictment ($76,636.28 from the Georgia Municipal Association), and far greater than the others. (Doc. 264 at 225).

Further, the testimony of Michael Cohen did not specifically tie the defendant on trial with the acts at issue. Mr. Cohen testified only that "a nice black man" who introduced himself as Mr. Pendergrass gave him the checks related to the Lee Family Trust, but he could not identify Defendant Allen Pendergrass as the person who gave him the checks at the time of trial. (Doc. 264 at 44, 55). Mr. Cohen did not know the name Terrell McQueen, but Mr. McQueen testified that he met with Mr. Cohen in person. (*Id.* at 220-21). Given the differences in the conduct, the substantial amount of money involved, and the limited evidence tying Defendant Pendergrass to these

transactions, the evidence should not have been admitted as intrinsic to the charged crimes.

Nor was this evidence admissible as 404(b) evidence. As noted above, 404(b) evidence and intrinsic evidence are subject to Rule 403. The probative value of the Lee Family Trust evidence was extremely limited for the same reasons that it was not intrinsic: the conduct was different, the amount of money was different, and there was little evidence showing that Mr. Pendergrass was involved in the fraud.

The limited probative value was substantially outweighed by the undue prejudice to Mr. Pendergrass. First, the very large sum of money certainly had a prejudicial effect, especially compared with the much smaller amounts involved in the indicted conduct. The scheme was also more elaborate than that involved in the charge conduct, as it included the use of Cohen in an attempt to legitimize the transactions. This invited the jury to punish Mr. Pendergrass for this conduct involving more money and a more sophisticated scheme, regardless of what the actual charges were.

Because this evidence was certainly substantially more prejudicial than probative, the district court abused its discretion in admitting the evidence. The error was not harmless for the same reasons that it was

unduly prejudicial, and it almost certainly had an undue influence on the jury's verdict. Indeed, the government emphasized this evidence in closing, arguing that it showed that Mr. Pendergrass "controlling the money," even if it came from McQueen, and inviting the jury to convict because Mr. Pendergrass also controlled the other bank accounts used to deposit the checks in the indictment. (Doc. 266 at 91-92).

    B.  <u>Holland & Knight</u>

The evidence as to McQueen's Holland & Knight fraud was likewise inadmissible. McQueen admitted to perpetrating that fraud himself, and the only evidence that Mr. Pendergrass knew that the proceeds were from fraud was from the testimony of McQueen, who was cooperating with the government to earn a lower sentence, and thus had a motive to fabricate Mr. Pendergrass's involvement. (Doc. 265 at 88-90). However, he admitted that the took the actions in the Holland & Knight matter while Mr. Pendergrass was on vacation. (*Id.* at 132). The evidence connecting Mr. Pendergrass to McQueen's conduct in the Holland and Knight matter was so weak that the district court did not include those funds in the loss amount attributable to Mr. Pendergrass. (Doc. 316 at 59).

Furthermore, the Holland & Knight account involved far more money that any of the charged acts: $359,000 versus sums between $8,000 and $76,636.28.  Given the limited evidence that Mr. Pendergrass was involved in this fraud, and the substantial sum of money involved, this evidence should not have been admitted as intrinsic to the charged crimes.  Nor was this evidence admissible as 404(b) evidence, for the same reasons: the limited probative value was substantially outweighed by the undue prejudice to Mr. Pendergrass.  As with the Lee Family Trust, the very large sum of money certainly had a prejudicial effect, especially compared with the much smaller amounts involved in the indicted conduct. This invited the jury to punish Mr. Pendergrass for this conduct involving more money, regardless of what the actual charges were. Because this evidence was certainly more prejudicial than probative, the district court abused its discretion in admitting the evidence.

C. Tousa Homes

The Tousa Homes account was out of Colorado and did not involve the City of Atlanta, unlike the acts in the indictment. (Doc. 264 at 200).  It also involved a slightly more sophisticated scheme, as McQueen testified that Mr. Pendergrass obtained a phone number to pose as Tousa Homes and they

set up a voicemail to make it appear that the number was for that business. (*Id.* at 205-06). Because the Tousa Homes matter did not involve funds from the City of Atlanta and was also factually distinguishable, the evidence was not intrinsic to the charged counts and should not have been admitted as such. For the same reasons, the evidence was more prejudicial than probative, and should have been excluded pursuant to Rule 403.

D. The combined prejudice from the erroneous admission of this evidence requires that Mr. Pendergrass's convictions be vacated.

While the erroneous admission each of these uncharged acts was unfairly prejudicial when viewed in isolation, the combined prejudice certainly compels reversal. Prior to trial, the government admitted that the "specific counts alleged in the Indictment involve incidents where co-defendant McQueen, not Defendant Pendergrass, signed and sent the forged documents," and a stipulation was read to the jury. (Doc. 71 at 3; Doc. 73 at 3; Doc. 265 at 97). Recognizing that it would have a problem convicting Mr. Pendergrass based on the fact that the charged fraud was all committed by Mr. McQueen, the government muddied the waters by admitting multiple additional acts to suggest that Mr. Pendergrass was a bad person and should be convicted despite the lack of evidence of his involvement with the specific charged acts.

The Holland & Knight act was discussed at least four different times during the three-day presentation of the government's case. (*See* Doc. 265 at 82-89, 94-98, 99-102, 129-133). The Lee Family Trust evidence was even more pervasive, with the act being discussed at least five times *in addition to* the separate witness called to testify about that incident alone. (*See* Doc. 264 at 89, 215-232; Doc. 265 at 63, 198-99, 208). This evidence thus pervaded the trial and made it difficult for the jury to parse the evidence that went to the counts in the indictment from the other acts evidence.

Furthermore, because there was no reliable evidence connecting Mr. Pendergrass to McQueen's actions in the Holland & Knight matter, and little evidence connecting Mr. Pendergrass to the Lee Family Trust, the evidence served only to confuse the issues to for the jury, and likely resulted in a prejudicial spillover effect. *See United States v. Wilkins*, 139 F.3d 603, 604-05 (8th Cir.1998) (affirming the granting of a Rule 33 motion based on the potential spill-over effects from evidence relating to charges dismissed during trial for insufficient evidence). Additionally, by admitting evidence related the Lee Family Trust and Tousa Homes, which involved entities in other states, the government made it appear as though Mr. Pendergrass had

55

orchestrated a vast fraudulent scheme that reached throughout the country. This surely created substantial prejudice to Mr. Pendergrass.

In sum, this uncharged acts evidence created a complete side-show that prevented the jury from focusing on what it was actually required to decide: whether Mr. Pendergrass committed the specific acts alleged in the indictment. The erroneous admission of this evidence created a substantial probability that Mr. Pendergrass was found guilty of the indicted counts because of evidence unrelated to those charges. As such, Mr. Pendergrass's convictions must be vacated.

IV.    The district court erred by applying the two-point enhancement for use of an authentication feature.

The aggravated identify theft statute provides for a two-year sentence for anyone who "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person. 18 U.S.C. § 1028A(a)(1). A "means of identification" includes "any name or number that may be used ... to identify a specific individual, including any ... official State or government issues driver's license or identification number." 18 U.S.C. § 1028(d)(7)(A).

The Sentencing Guidelines add two levels to the offense level of a defendant convicted of mail fraud if the offense involved "the possession or

use of any ... authentication feature." U.S.S.G. § 2B1.1(b)(11)(A)(ii). The

phrase "authentication feature" is defined as:

> any hologram, watermark, certification, symbol, code, image,
> sequence of numbers or letters, or other feature that either
> individually or in combination with another feature is used by
> the issuing authority on an identification document, document-
> making implement, or means of identification to determine if the
> document is counterfeit, altered, or otherwise falsified.

18 U.S.C. § 1028(d)(1); *see* U.S.S.G. § 2B1.1 comment n.10(A). However, the

Commentary provides that, if a defendant is convicted of violating § 1028A,

and a "sentence under this guideline is imposed in conjunction with a

sentence for an underlying offense," no "specific offense characteristic for

the transfer, possession, or use of a means of identification" should be

applied when determining the sentence for the underlying offense. U.S.S.G.

§ 2B1.6(a) comment n.2. This is because a "sentence under this guideline

accounts for this factor for the underlying offense of conviction, including

any such enhancement that would apply based on" relevant conduct. *Id.*

"This means that when a defendant receives the two-year consecutive

sentence on the identity theft count, "her sentence for any underlying offense

is not eligible for a 2–level increase for 'transfer, possession, or use' of false

identification." *United States v. Cruz*, 713 F.3d 600, 607 (11th Cir. 2013). The

"this factor" as used in the second clause, is "the transfer, possession, or use

of a means of identification." *Id.* Thus, § 2B1.6 permits an offense-level enhancement for defendants who are also convicted under 18 U.S.C. § 1028A *only* if there was "conduct that is separate from or in addition to the simple transfer, possession, or use of the means of identification at issue." *United States v. Taylor*, 818 F.3d 671, 676 (11th Cir. 2016) (citing *Cruz*, 713 F.3d at 607).

Here, the district court applied the authentication enhancement based on its conclusion that the signatures on the power of attorney forms were a "means of identification" and the notary stamp on those forms was an additional authentication feature. (Doc. 316 at 10-13, 63-64). However, the notary stamp was merely a part of the power of attorney forms; there was no "conduct that is separate from or in addition to" the use of the power of attorney form. *See Taylor*, 818 F.3d at 676. The use of the notary stamp was thus a part the same conduct—the use of the means of identification, the power of attorney form. Mr. Pendergrass was thus punished twice for the same conduct, contrary to the directive of U.S.S.G. § 2B1.1 comment n.10(A). As such, his sentence must be vacated and this Court must remand for resentencing without this enhancement.

V.    <u>The district court plainly erred by denying Mr. Pendergrass his right to allocute at sentencing.</u>

This Court reviews the district court's denial of a defendant's right to allocute at sentencing for plain error when the defendant failed to object before the district court. *United States v. Doyle*, 857 F.3d 1115, 1118 (11th Cir. 2017). To establish plain error, Mr. Pendergrass must show that (1) there was an error, (2) it was plain, (3) it affected substantial rights, and (4) it seriously affected the fairness of the judicial proceedings. *Id.* "An error is plain if it is clear or obvious." *United States v. Innocent*, 977 F.3d 1077, 1081 (11th Cir. 2020) (internal quotation marks omitted). And an error affects a defendant's substantial rights if there is "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (internal quotation omitted).

The right to allocution "provides a defendant the opportunity to plead personally with the district court for leniency in sentencing and to state any potentially mitigating factors for consideration." *United States v. Machado*, 886 F.3d 1070, 1087 (11th Cir. 2018). Federal Rule of Criminal Procedure 32(i)(4)(A)(ii) codifies that right, and requires the district court, before imposing sentence, to "address the defendant personally in order to permit

59

the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii). This Court has found plain error where the court failed to address the defendant personally. *See, e.g., United States v. Perez*, 661 F.3d 568, 584–85 (11th Cir. 2011) (per curiam) (finding plain error where the district court asked defense counsel—rather than the defendant— whether the defendant would allocute).

This Court has presumed that the failure to address the defendant personally affects the defendant's substantial rights "whenever the possibility of a lower sentence exists." *Perez*, 661 F.3d at 856. Indeed, a defendant is generally entitled to a presumption that he was prejudiced by the district court's failure to afford him his right of allocution even if he received a sentence at the low end of the advisory guidelines range. *Doyle*, 857 F.3d at 1120-21. "Because allocution plays a central role in the sentencing process, the denial of this right is not the sort of isolated or abstract error that does not impact the fairness, integrity or public reputation of judicial proceedings." *United States v. Prouty*, 303 F.3d 1249, 1253 (11th Cir. 2002) (internal quotation marks omitted and alteration accepted).

Here, the district court did not address Mr. Pendergrass personally to give him an opportunity to allocute. (*See generally* doc. 316). Nor did the

court ask his counsel whether Mr. Pendergrass would like to allocute. (*Id.*). This constitutes plain error. *See, Perez*, 661 F.3d at 584-85. Although Mr. Pendergrass received a below-guidelines sentence, the sentence could have been lower. *See Perez*, 661 F.3d at 856. Mr. Pendergrass could have advocated for a further downward variance, as only the aggravated identity theft counts carried a mandatory sentence of two years. *See* 18 U.S.C. § 1028A. Consequently, the error affected his substantial rights. Finally, this Court has held that the denial of the right to allocution impacts the fairness, integrity, or public reputation of judicial proceedings. *See Prouty*, 303 F.3d at 1253.

Accordingly, Mr. Pendergrass has established plain error. Therefore, his sentence must be vacated to give him the opportunity to exercise his right to allocution.

## CONCLUSION

For the reasons articulated above, this Court should vacate Mr. Pendergrass's convictions and sentences.

Dated:  This 7th day of February, 2023.

Respectfully submitted,

*/s/ Sydney R. Strickland*
Sydney R. Strickland
Georgia Bar No. 418591
Attorney for Allen Pendergras

STRICKLAND WEBSTER, LLC
830 Glenwood Ave SE
Suite 510 #203
Atlanta, GA 30316
Telephone: (404) 590-7967
Facsimile:  (404) 393-3617
sydney@stricklandwebster.com

CERTIFICATE OF COMPLIANCE

This brief contains 12,786 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Brief was filed by uploading it with the Eleventh Circuit's Electronic Filing System which will automatically serve opposing counsel with the Brief.

Dated:  This 7th day of February, 2023.

Respectfully submitted,

*/s/ Sydney R. Strickland*
Sydney R. Strickland
Georgia Bar No. 418591
Attorney for Allen Pendergrass

STRICKLAND WEBSTER, LLC
830 Glenwood Ave SE
Suite 510 #203
Atlanta, GA 30316
Telephone: (404) 590-7967
Facsimile:  (404) 393-3617
sydney@stricklandwebster.com